2013-1560

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MAC INTERNATIONAL FZE

Appellant,

v.

John McHugh, SECRETARY OF THE ARMY,

Appellee.

---

Appeal From the Armed Services Board of Contract Appeals No. 56355,
Administrative Judge Diana S. Dickinson

---

## Brief For Appellant MAC International FZE

Sara Beiro Farabow
Donald G. Featherstun
Daniel P. Wierzba
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington DC  20004
Tel:  202-828-3591
Fax: 202-828-5393

ATTORNEYS FOR THE
APPELLANT
MAC INTERNATIONAL FZE

Dated:  October 15, 2013

## CERTIFICATE OF INTEREST

Counsel for MAC International FZE certifies the following:

1.      The full name of every party or amicus represented by me is: MAC International FZE.

2.      The name of the real party in interest represented by me is: MAC International FZE.

3.      All partner corporations and any publicly held companies that own 10 percent of more of the stock of the party or amicus represented by me are: General Motor Corporation (10 percent).

4.      The names of all law firms and the partners or associates that appeared for the part or amicus now represented by me in the trial court or agency or are expected to appear in this court are:  Seyfarth Shaw LLP (Sara Beiro Farabow, Donald G. Featherstun, Joshua C. Drewitz and Daniel P. Wierzba.)


                                                    _/s/ Daniel P. Wierzba_____
                                                    Sara Beiro Farabow
                                                    Donald G. Featherstun
                                                    Daniel P. Wierzba
                                                    Seyfarth Shaw LLP

Dated:  October 15, 2013

# <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF CONTENTS.................................................................. ii

TABLE OF CASES, STATUTES AND OTHER AUTHORITIES ........................v

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE..............................................................2

STATEMENT OF FACTS ..................................................................5

I.     The CPA Issued A Contract And Delivery Orders To MAC Using U.S. Government Forms, U.S. Government Personnel, And U.S. Appropriated Funds. ..................................................................5

II.    MAC Delivered The Ordered Vehicles, U.S. Government Representatives Inspected And Accepted The Vehicles, MAC Received Payment In U.S. Appropriated Funds, But MAC Invoices Under 16 Delivery Orders Were Paid Late. ..................................................7

III.   The Government's Actions Led MAC To Believe It Would Be Paid In Full Until The Government Reversed Course Years After MAC Fully Performed On The Contract, And The Parties Carved Out The Prompt Payment Interest Claims From A Previous Settlement. ................................11

IV.   At the Time of Award, The CPA Was an Entity of the United States Government. ..................................................................13

V.    The CPA Was Created And Functioned As An Executive Agency Of The United States, And Specifically As A Component Of The Department Of Defense. ..................................................................17

VI.   The Defense Department Successor Contracting Offices To The CPA
      Continued To Use This Contract Pursuant to the Defense
      Department's Direction To Order Vehicles Long After The CPA Itself
      Dissolved. .................................................................................................18

SUMMARY OF THE ARGUMENT .......................................................20

STANDARD OF REVIEW ......................................................................22

ARGUMENT ...........................................................................................23

I.    The Board Erred In Dismissing MAC's Prompt Payment Interest
      Claim Because the Prompt Payment Act Applies To The 16 Delivery
      Orders Funded By U.S. Appropriated Funds. ................................23

      A.    The Prompt Payment Act Applies To All U.S. Executive
            Agencies And Their Components......................................23

      B.    The Prompt Payment Act Is Applicable Here, And There Is No
            Dispute That The U.S. Government Paid MAC Late.......................24

      C.    The ASBCA Erred In Dismissing MAC's Appeal By Relying
            On Two Cases From The Court of Federal Claims That
            Involved Factual Scenarios Completely Different From The
            Case. ................................................................................28

II.   The Board Has Jurisdiction Over This Contract Executed By The
      Coalition Provisional Authority......................................................33

      A.    The Contract Disputes Act Expressly Confers Jurisdiction
            Over Contracts Entered Into By Executive Agencies or
            Components. ....................................................................33

      B.    The Contract Disputes Act And Title 5 Clearly Establish That
            Government Agencies, Such As The Department Of The
            Defense And Department Of The Army, Are Government
            Entities............................................................................33

      C.    The Coalition Provisional Authority Is An Executive Agency
            Of The United States Government.....................................35

            1.    Both Congress And The CPA Declared The CPA Was
                  An Entity Of The United States .............................35

2.    The CPA Was Included In Title 5 By Virtue Of Its Status As A Component Of The Department Of Defense...................35

a.    The CPA Was Not The International Coalition Itself, The CPA Was The DoD's Administrative Arm Providing Stability During Reconstruction............35

b.    The CPA Was A Component Of The Department Of Defense And Therefore Included Under Title 5's Designation Of DoD As An Executive Agency.......36

(1)    CPA As A Component Of The Department Of Defense Falls In Line With The Statutory Language And Prior ASBCA Precedent..............36

(2)    The Defense Department's Treatment Of The CPA Clearly Shows That The Department Considers the CPA As A Defense Department Component. ..........................................................38

3.    The Government Argued In A Separate Case That The CPA Was An Instrumentality Of The United States. ...............39

4.    The Contract Was Awarded By The CPA Contracting Activity, Which Was A Department Of Defense Entity...........43

a.    W914NS Is The DODAAC For The United States Army Corps Of Engineers Iraq Reconstruction Office. ..........................................................................43

b.    The Contract And Delivery Orders Each Indicated That Payment Was To Be Made By U.S. Government Entities. ......................................................44

CONCLUSION .....................................................................46

PROOF OF SERVICE ...........................................................49

CERTIFICATE OF COMPLIANCE.......................................50

# TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

**Page(s)**

## CASES

*A & S Council Oil Co., Inc. v. Lader*,
  56 F.3d 234 (D.C. Cir. 1995) ...............................................................34

*Anselma Crossing, L.P. v. United States Postal Serv.*,
  637 F.3d 238 (3d Cir. 2011) ................................................................34

*Arkansas Best Freight Sys., Inc. v. United States*,
  20 Cl. Ct. 776 (1990) ..........................................................................27

*Arnold M. Diamond, Inc. v. Dalton*,
  25 F.3d 1006 (Fed. Cir. 1994) ............................................................22

*Bright v. United States*,
  603 F.3d 1273 (Fed. Cir. 2010) ..........................................................22

*C. Sanchez & Son, Inc. v. United States*,
  6 F.3d 1539 (Fed. Cir. 1993) ..............................................................25

*City of Burbank v. United States*,
  47 Fed. Cl. 261 (2000), *rev'd on other grounds*
  273 F.3d 1370 (Fed. Cir. 2001) ..........................................................34

*Eagle Alliance*,
  ASBCA No. 56315, 08-1 BCA ¶ 33,828 .............................................37

*Eimskipafeleg Island, EHF*,
  ASBCA No. 55209, 07-2 BCA ¶ 33,620 .............................................34

*Engage Learning, Inc. v. Salazar*,
  660 F.3d 1346 (Fed. Cir. 2011) ..........................................................33

*Gosselin World Wide Moving NV*,
  ASBCA No. 55365, 06-2 BCA ¶ 33,428 .............................................24

*Gould, Inc. v. United States*,
  67 F.3d 925 (Fed. Cir. 1995) ..............................................................22

*Held & Francke Bauaktiengesellschaft GmnH,*
  ASBCA No. 42463, 42464, 92-1 BCA ¶ 24,712...............................................27

*Henke v. United States*,
  60 F.3d 795 (Fed. Cir. 1995) ...............................................................22

*Laudes Corp. v. United States*,
  84 Fed. Cl. 298 (2008) ("Laudes I").........................................30, 31, 32

*Laudes Corp. v. United States*,
  86 Fed. Cl. 152 (2009) ("Laudes II") ...........................................28, 29

*Lear Siegler Servs. v. Rumsfeld*,
  457 F.3d 1262 (Fed. Cir. 2006) ..........................................................23

*MAC Int'l FZE*,
  ASBCA No. 56355, 10-2 BCA ¶ 34,591 ("MAC I")..................................passim

*MAC Int'l FZE*,
  ASBCA No. 56355, 13-1 BCA ¶ 35,299 ("MAC II")................................passim

*Maersk Line, Ltd.*,
  ASBCA No. 55391, 07-2 BCA ¶ 33,621 ............................................34

*Orff v. United States*,
  545 U.S. 596 (2005)..........................................................................22

*Pac. Gas & Elec. Co. v. United States*,
  536 F.3d 1282 (Fed. Cir. 2008) ................................................. 24-25

*Reynolds v. Army & Air Force Exch. Serv.*,
  846 F.2d 746 (Fed. Cir. 1988) .................................................. 22-23

*Technology for Comm'ns Int'l*,
  ASBCA Nos. 36265, 36841, 93-3 BCA ¶ 26,139 ............................................27

*United States ex rel DRC, Inc. v. Custer Battles, LLC*,
  444 F. Supp. 2d 678 (E.D. Va. 2006) ................................................41

*United States ex rel DRC, Inc. v. Custer Battles, LLC*,
  562 F.3d 295 (4th Cir. 2009) ............................................ 39-40, 41-42

*Versar, Inc.*,
    ASBCA No. 56857, 12-1 BCA ¶ 35,025............................................................24

*Wesleyan Co., Inc. v. Harvey*,
    454 F.3d 1375,1378 (Fed. Cir. 2006) ..........................................................23, 33

## STATUTES

5 U.S.C. § 101 ...............................................................................................34, 36

5 U.S.C. § 102 ...............................................................................................34, 36

5 U.S.C. § 104 .......................................................................................................36

28 U.S.C. § 1295(10) .............................................................................................1

31 U.S.C. § 3901 ...............................................................................................4, 23

31 U.S.C. § 3902 .................................................................................................23

31 U.S.C. § 3907 .............................................................................................. 25-26

41 U.S.C. § 7101 ...................................................................... 16, 22, 33-34, 36

41 U.S.C. § 7102 .................................................................................................33

41 U.S.C. § 7107 ...............................................................................................1, 22

41 U.S.C. § 7109 ...............................................................................................2, 20

Emergency Supplemental Appropriations Act for Defense and for the
    Reconstruction of Iraq and Afghanistan, 2004,
    Pub. L. No. 108-106, 117 Stat. 1209 (2003) ......................................... 13-14, 35

## OTHER AUTHORITIES

48 C.F.R. 52.212-4...........................................................................................passim

48 C.F.R. 52.232-18............................................................................................16

48 C.F.R. 52.233-1..................................................................................16, 25, 32

Contractor Support in the Department of Defense: Hearing Before the
Readiness Subcomm. of the H. Comm. on Armed Services, 108th Cong.
2d Sess. (June 24, 2004) (Testimony of Tina Ballard, Deputy Assistant
Secretary of the Army (Policy and Procurement), Department of Army) .........15

Defense Logistics Agency, Logistics Management Standards Frequently
Asked Questions ...............................................................................................44

Financial Management Service, Federal Account Symbols and Titles: The
FAST Book II, Part II (April 2013)...................................................................45

## STATEMENT OF RELATED CASES

*MAC International FZE v. McHugh*, Docket No. 2011-1233, was voluntarily

dismissed on May 4, 2012 after the parties entered into a written settlement

agreement and contract modification.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1295(10).

The appeal is taken pursuant to 41 U.S.C. § 7107 of the Contract Disputes Act

("CDA") from a decision of the Armed Services Board of Contract Appeals

("ASBCA") which dismissed various claims asserted by Appellant for lack of

jurisdiction.

## STATEMENT OF THE ISSUES

I.     Whether the U.S. government is liable for payment of Prompt

Payment Act interest arising from a contract executed by the Coalition Provisional

Authority that expressly incorporated by reference the Contract Disputes Act and

Prompt Payment Act, where the contract called for and the contractor was paid in

U.S. appropriated funds, where the Government admits the Prompt Payment Act is

applicable to the specific delivery orders at issue, and where the Government

admitted it paid late?

II.     Whether the ASBCA erred in determining that it lacked subject matter

jurisdiction over MAC International FZE's Prompt Payment Act interest claim

under a contract with the Coalition Provisional Authority, an executive agency of the United States?

## STATEMENT OF THE CASE

This appeal arises from a contract between MAC International FZE ("MAC") and the Coalition Provisional Authority ("CPA") for delivery of vehicles to the CPA in Iraq, which was awarded to MAC on April 24, 2004.  Between September 13, 2004 and June 6, 2005, MAC delivered some 7,602 vehicles to the CPA and was paid by the United States Government using U.S. appropriated funds for 16 specific delivery orders that are issue in this case.  MAC received payment for $120,656,251, but the Government admittedly was late in paying 51 of MAC's invoices under those delivery orders.  In spite of the Government's admissions that (1) this Contract is subject to and governed by the PPA; (2) MAC performed its contractual obligations; (3) MAC submitted invoices to the Government for payment; and (4) the Government paid several invoices late, the Government has not paid MAC any interest as mandated by the Prompt Payment Act and its implementing regulations.  In total, the Government has failed to pay MAC $420,582.72 in Prompt Payment Act interest, and MAC is also entitled to recover CDA interest, accruing from the date the contracting officer received the certified claim until paid.  41 U.S.C. § 7109(a).

After MAC had fully performed its contractual obligations and the Government accepted each and every vehicle that MAC delivered under the Contract, MAC repeatedly sought payment for its outstanding invoices. For over two years, the Contracting Officers assigned to MAC's Contract continually assured MAC that it would be paid or that they were working on processing the outstanding invoices that the Government admitted MAC was owed. The process consisted of MAC seeking payment and submitting documentation as the Contracting Officers requested. In December 2007, over two years after MAC fully performed its contractual obligations and approximately three and a half years after the CPA dissolved, the Contracting Officer sent a brief but astounding email to MAC stating that control of DFI funds was transferred to the Iraqi Government after the CPA was dissolved.

On February 14, 2008, MAC sent a certified claim under the CPA to the responsible Contracting Officer at the successor organization to the CPA, the Joint Contracting Command Iraq/Afghanistan ("JCC-I/A"), requesting a final decision on its claim under the Contract for a total of $5,598,129.52. Joint Appendix ("JA") 86-99. On February 22, 2008, the Contracting Officer sent a letter to MAC acknowledging the certified claim and instructing MAC to "consider this response as a deemed denial." On March 18, 2008, MAC filed a Notice of Appeal and its

complaint with the ASBCA appealing the deemed denial of its certified claim. The ASBCA docketed the appeal as ASBCA No. 56355.

MAC's claim essentially sought two categories of recovery. The largest category was the outstanding contract balance and statutory interest owed under the Prompt Payment Act, 39 U.S.C. § 3901 *et seq*. ("PPA"), in connection with Delivery Orders 8 and 9, which were funded by Development for Iraq ("DFI") funds. As discussed below, the parties have settled that category. MAC's claim also sought PPA interest based on payments the Government admitted it paid late for the 16 delivery orders funded using U.S. appropriations.

With respect to the claim pertaining to DFI-funded delivery orders, the ASBCA granted the Government's motion and dismissed MAC's claim for lack of jurisdiction. *MAC Int'l FZE*, ASBCA No. 56355, 10-2 BCA ¶ 34,591 ("MAC I"). MAC timely appealed that decision to this Court, which was docketed as Case No. 2011-1233. Shortly after MAC submitted its opening brief in that case, the parties engaged in settlement discussions and ultimately notified the court-appointed mediator that the parties had reached settlement. The appeal was voluntarily dismissed on May 4, 2012 after the parties entered into a written settlement agreement and Contract modification.

A year later, the Government moved to dismiss for lack of jurisdiction MAC's claim with respect to the PPA interest claimed under the separate 16

4

delivery orders funded by U.S. appropriated funds.  The ASBCA again granted the Government's motion on the grounds that the CPA was not a component of the Department of Defense or an executive agency of the United States.  *MAC Int'l FZE*, ASBCA No. 56355, 13-1 BCA ¶ 35,299 ("MAC II").  As discussed below, the ASBCA's decision was in error for the following reasons: (1) the Contract expressly incorporated the PPA by reference, the Government admitted MAC performed its contractual obligations, and the Government admitted it has paid late; and (2) the CPA is an entity of the U.S. government, as evidenced by statements made by Congress, statements made by the CPA itself, the language of the Contract, and statements made by the contracting officer.

## STATEMENT OF FACTS[1]

I.    **The CPA Issued A Contract And Delivery Orders To MAC Using U.S. Government Forms, U.S. Government Personnel, And U.S. Appropriated Funds.**

On February 23, 2004, only months after its creation, the CPA issued Solicitation No. W914NS-04-R-0112 (the "Solicitation") for provision of a supply line of vehicles to be delivered to Iraq for the CPA's use and for the reconstruction of Iraq.  JA24, JA310.  The Solicitation requested proposals for an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract for vehicles to be provided upon

---

[1]  This case was decided at a motion to dismiss during the pleading stage. Therefore, the allegations are presented herein as facts and in accordance with the Joint Statement of Undisputed Facts filed with the ASBCA.  JA306-327.

the issuance of delivery orders. *Id.* MAC responded to the Solicitation and was ultimately awarded the contract, W914NS-04-D-0017 (the "Contract") on April 24, 2004. JA24; JA570; *MAC I*, ASBCA No. 56355, at 11.

MAC delivered to the CPA 7,602 vehicles, with a total value of $125,600,751.00, each ordered by a United States ("U.S.") contracting officer, inspected and accepted by U.S. officials and used to fulfill the goals of the U.S. in Iraq. JA571; *MAC I,* ASBCA No. 56355, at 12. There is no dispute about MAC delivering the vehicles, the U.S. accepting and using the vehicles, or the amount of money owed to MAC for the vehicles. JA571-572; *MAC I,* ASBCA No. 56355, at 12-13. The only argument made by the U.S. Government as to why MAC is not entitled to PPA interest is that the CPA is not a U.S. Government entity.

MAC worked exclusively with U.S. contracting personnel in Iraq under this Contract while the identity of the contracting office changed several times. JA571-572; *MAC I,* ASBCA No. 56355, at 12-13. The CPA - Contracting Activity awarded the original contract, then, according to its own terms, administration of the Contract transferred to the U.S. Department of Defense's Project and Contracting Office ("PCO"), which finally became the Defense Contract Management Agency's ("DCMA") JCC-I/A. JA571-572; *MAC I,* ASBCA No. 56355, at 11-12. Each transition was seamless to MAC; the name of the agency may have changed but its identity remained the same.

6

II.    **MAC Delivered The Ordered Vehicles, U.S. Government Representatives Inspected And Accepted The Vehicles, MAC Received Payment In U.S. Appropriated Funds, But MAC Invoices Under 16 Delivery Orders Were Paid Late.**

No matter what name the Contracting Activity was operating under, it still maintained the Contract under a Corps of Engineers Department of Defense Activity Address Code ("DoDAAC"), it still ordered vehicles for U.S. purposes, and it still paid MAC from U.S. appropriated funds from Defense Finance and Accounting Service ("DFAS").  JA24; JA311, JA317.  For over a year MAC received orders and delivered vehicles under the Contract to the United States officials at the CPA and its successors.  JA317.  MAC was paid with appropriated funds, and the Government has enjoyed the benefits of those vehicles.  *Id*.

The Government issued 16 delivery orders to MAC that were each paid with appropriated funds.  These 16 Delivery Orders, and the Prompt Payment interest associated with the Government's late payments under them, are the subject of MAC's claim and this case.  JA4; *MAC II*, ASBCA No. 56355, at 4.  However, the Government admittedly paid late.  *See* JA118, 141-42, 146.  In total, MAC is owed $420,582.72 in Prompt Payment interest from the Government for the 51 invoices the Government paid late.[2]  JA4; *MAC II*, ASBCA No. 56355, at 4; JA97-99.

---

[2]  MAC's claim for PPA interest was $653,629.52.  JA86-99.  However, that amount contained interest associated with Delivery Orders 8 and 9, which the parties resolved pursuant to a settlement agreement.  JA588-590.

On April 24, 2004, Delivery Order No. 1 valued at $26,956,000.00 was issued. JA42. That same date, Delivery Order No. 2, valued at $2,506,845.00, was issued. JA44. On May 11, 2004, Delivery Order No. 3 worth $4,401,110.00 was issued. JA46. On May 18, 2004, Delivery Order No. 4 worth $5,687,960.00 was issued. JA49. On June 6, 2004, Delivery Order No. 6 for $217,420.00 was issued. JA51. That same date, June 6, 2006, Delivery Order No. 7 for $6,120,000.00 was issued. JA54. On June 16, 2004, Delivery Order No. 11 for $874,000.00 was issued. JA56. That same date, June 16, 2004, Delivery Order No. 12 for $1,513,650.00 was issued. JA61. The CPA issued Delivery Orders 1 through 12.

On July 8, 2004, Delivery Order No. 13 for $172,498.00 was issued. JA65. On July 17, 2004, Delivery Order No. 14 for $922,340.00 was issued to MAC. JA67. At some point before April 2, 2005, Delivery Order No. 15 was issued. JA3; *MAC II*, ASBCA No. 56355, at 3. On July 22, 2004, Delivery Order No. 16 for $1,616,000.00 was issued. JA69. On July 23, 2004, Delivery Order No. 17 for $33,986,948.00 was issued. JA72. On July 26, 2004, Delivery Order No. 18 for $10,295,096.00 was issued. JA73. On January 2, 2005, Delivery Order No. 20 $248,610.00 was issued. JA76. On August 11, 2005, Delivery Order No. 21 was issued. JA83. Delivery Orders 13 through 20 were issued by the PCO, which, as

described below, was an entity of the U.S. Department of Defense.[3]  Delivery

Order No. 21 was issued by the JCC-I/A.  The JCC-I/A was established by the U.S.

Government in 2004 to replace the PCO and consolidate contracting activities and

reports through the Deputy Assistant Secretary of the Army for Acquisition,

Logistics and Technology.  The Government has not disputed that the JCC-I/A is a

U.S. Government entity.

It is undisputed that all of the delivery orders at issue in this appeal were

designated and paid using U.S. appropriated funds.  JA3; *MAC II*, ASBCA No.

56355, at 3.  Delivery Order No. 4 originally listed "DFI Transfer" as the funding

source.  JA49.  However, it was modified on June 5, 2004 to "change the type of

funding applied" to it.  JA316.  This modification changed the funding source for

Delivery Order No. 4 from DFI funds to U.S. appropriated funds.  JA316.

Delivery Order No. 5 was originally issued with "DFI transfer" as the funding

source, but the Government cancelled that order the day after it was issued.

JA317.  It is undisputed that, other than these cancelled orders, the orders that were

executed, performed by MAC, and paid by the Government, used U.S.

appropriated funds.  JA3; *MAC II*, ASBCA No. 56355, at 3; JA317.

---

[3]  Delivery Order Nos. 18 and 19 state they were issued by the CPA even though
those orders were issued after the CPA dissolved.  JA3; *MAC II*, ASBCA No.
56355, at 3.

MAC delivered vehicles to the Government in accordance with the terms of the Contract and delivery orders. When it received the vehicles, the Government's agents completed "DD Form 250," which is the U.S. Government contract standard Inspection Report. JA317. MAC submitted DD Forms 250 for each delivery, together with its invoice, to the Government, along with a copy to either the U.S. Army Corps of Engineers Finance Center or the Government's DFAS office in Indianapolis. JA317-318. In fact, the Government admitted that MAC submitted invoices to the U.S. Government for payment after Government personnel accepted delivery of the subject vehicles. JA141.

It is undisputed that MAC was paid for the vehicles delivered under the 16 delivery orders at issue using U.S. appropriated funds. JA3; *MAC II*, ASBCA No. 56355, at 3. On the 16 delivery orders at issue, the Government paid MAC $120,802,461.80. There is also no dispute that the Government paid several of MAC's invoices late. The Government admitted that it "failed to make on time payments for some of the invoices under D/Os funded with appropriated funds." JA142. Indeed, the Government admitted that the PPA is applicable to those delivery orders issued to MAC that were funded with U.S. appropriated funds, the only orders at issue in this matter. JA142.

III.   **The Government's Actions Led MAC To Believe It Would Be Paid In Full Until The Government Reversed Course Years After MAC Fully Performed On The Contract, And The Parties Carved Out The Prompt Payment Interest Claims From A Previous Settlement.**

All of the delivery orders at issue in this appeal were paid, but were admittedly paid late by the Government.  MAC had two delivery orders, which were at issue in the prior appeal, that the Government refused to pay.  Those orders were allegedly funded with DFI, and MAC made inquiries to the Administrative Contracting Officer ("ACO") in an attempt to get those delivery orders paid.

MAC demanded payment and resubmitted invoices and delivery confirmations requested by the Government agents who were processing MAC's payment requests.  In June 2006, the Contracting Officer informed MAC that it was "unfortunate that our offices cannot give you a better response regarding payment with DFI funds."  JA322.

By memoranda in early April 2006, nearly a year after MAC finished performing it work on the Contract and nearly two years after the CPA dissolved, the Contract's ACO requested that the Joint Area Support Group (JASG) Comptroller forward funds to MAC for payment against Delivery Orders 8 and 9.  JA323.  The ACO submitted another written request to the JASG in May 2006 to forward additional funds to MAC against Delivery Orders 8 and 9.  JA323-324.

In January 2007, MAC sent an email to the Contracting Officer asking for assistance in getting payment for Delivery Orders Nos. 8 and 9.  The Contracting

Officer sent an email to the DFI Disbursing Officer, asking how payments to the Contract could be tracked. JA324. The DFI Disbursing Officer forwarded that email to the Trade Bank of Iraq, and a bank representative replied that funds for Delivery Orders Nos. 8 and 9 were returned to the DFI account. JA324.

After receiving the email from the Iraqi bank, the Contracting Officer resubmitted MAC's payment packages for Delivery Orders Nos. 8 and 9 in March 2007. In July 2007, over three years after the CPA dissolved, the Contracting Officer requested that the JASG Comptroller forward funds to MAC for payment against Delivery Orders Nos. 8 and 9. JA325. The JASG Comptroller forwarded those requests to the Central Bank of Iraq. JA325.

Several months later, and after all the communication between MAC and the Government, as well as between the Government and the Iraqi bank, the Government reversed course. In an e-mail dated December 8, 2007, the Contracting Officer informed MAC that the control of DFI funds was under the control of the CPA at the time the Government awarded MAC the Contract, and that "[w]hen the CPA was dissolved, the control of the funds was transferred to Government of Iraq." JA323.

MAC filed its certified claim shortly after this astonishing email from the Contracting Officer, and MAC appealed the Contracting Officer's deemed denial to the ASBCA.

After MAC appealed the ASBCA's prior decision dismissing that part of MAC's appeal related to Delivery Orders Nos. 8 and 9, and during the pendency of that appeal before this Court, the parties entered into a settlement agreement that resolved MAC's claim against the Government with respect to those delivery orders.  As part of the settlement agreement, MAC waived its right to seek CDA or PPA interest for amounts owed under Delivery Orders 8 and 9 because the Government stated that there were insufficient funds to pay the interest.  However, the parties expressly carved out MAC's claim for PPA interest against the Government for those delivery orders that were funded and paid using U.S. appropriated funds.  *See* JA1; *MAC II*, ASBCA No. 56355, at 1.  Specifically, the settlement agreement and Contract modification stated: "All of the assertions and statements made in this bilateral modification are limited to the Delivery Orders and *are not to be used to interpret Contract regarding W914NS-04-D-0117 with regard to any other delivery order*."  JA590 (emphasis added).

## IV.    At the Time of Award, The CPA Was an Entity of the United States Government.

The United States Congress, the CPA itself, and other sources considered the CPA a United States government entity.  When Congress provided appropriations for the CPA for Fiscal Year 2004, it referred to the CPA as follows:  "That funds appropriated under this heading shall be apportioned only to the Coalition Provisional Authority in Iraq (*in its capacity as an entity of the United States*

*Government*)…"  Emergency Supplemental Appropriations Act for Defense and

for the Reconstruction of Iraq and Afghanistan, 2004, Pub. L. No. 108-106,

§ 2101, 117 Stat. 1209, 1225 (2003) ("FY2004 Appropriations") (emphasis added).

Further, Section 2208 of that same law stated:

> Any reference in this chapter to the "Coalition Provisional Authority
> in Iraq" or the "Coalition Provisional Authority" shall be deemed to
> include any successor United States Government entity with the same
> or substantially the same authorities and responsibilities as the
> Coalition Provisional Authority in Iraq.

117 Stat. at 1231.

Information provided by the CPA itself during the pre-bid process for this

contract indicates that its sector program management offices (SPMOs) are part of

the federal government.  In a written response to a question asked at a January 21,

2004, pre-proposal conference on contracting opportunities, the CPA stated that

"the Sector Program Management Office (SPMO) *is a Government entity*. "

JA425; L. Elaine Halchin, CRS Report for Congress, The Coalition Provisional

Authority (CPA): Origin, Characteristics and Institutional Authorities (June 6,

2005), at CRS-8 ("June 2005 CRS Report"), citing Coalition Provisional

Authority, "List of Questions and Answers Compiled from a Pre-Proposal

Conference Held on Jan. 21, 2004," p. 20 (emphasis added).

Throughout the life of the CPA, the Army continued to accept responsibility

for the CPA's execution of contracts and reconstruction in Iraq.

> On May 21, 2003, the Deputy Secretary of Defense designated the Secretary of the Army as the Department of Defense Executive Agent for the Office of Reconstruction and Humanitarian Assistance, later to become the Coalition Provisional Authority (CPA) in Iraq, with responsibility to provide administrative, logistics, and contracting support for the relief and reconstruction for the people of Iraq. On January 14, 2004, the Deputy Secretary of Defense further assigned responsibility for Acquisition and Program Management Support for CPA to the Secretary of the Army to include all aspects of contracting and program management. As such, the Army is responsible for the execution of the $18.6 billion appropriated by the U.S. Congress for the reconstruction and humanitarian relief effort.

JA505; Contractor Support in the Department of Defense: Hearing Before the Readiness Subcomm. of the H. Comm. on Armed Services, 108th Cong. 2d Sess. (June 24, 2004) (Testimony of Tina Ballard, Deputy Assistant Secretary of the Army (Policy and Procurement), Department of Army).

The Contracting Officer that procured the Contract stated that it was his understanding that the CPA was an entity of the United States. JA343-344. Similarly, the Administrative Contracting Officer ("ACO") testified that she knew that MAC's Contract was subject to the CDA, and agreed that nothing in the Contract indicated that the orders could have been funded by anything other than appropriated funds. JA344; JA356.

The Contracting Officer who solicited and awarded the procurement was an officer of the United States Air Force and had a United States contracting warrant. JA310-311. The Contract was awarded upon a Standard Form ("SF") 1449, which is used in the solicitation/order of commercial items by the United States

Government.  JA24.  The SF 1449 states that the contract is being issued and administered by the CPA-Contracting Activity and that payments under the contract will be made by "DFAS-IN DNO", which stands for the U.S. Government's Defense Finance and Accounting Service, Indianapolis Branch, Directorate for Network Operations. JA24.

The Contract further incorporated United States Federal Acquisition Regulation ("FAR") and the Department of Defense Federal Acquisition Regulations Supplement ("DFARS") clauses and provisions, including 48 C.F.R. ("FAR") 52.212-4 "Contract Terms and Conditions", and FAR 52.233-1 "Disputes," which both expressly state that "[t]his Contract is subject to the Contract Disputes Act of 1978, as amended by (41 U.S.C. §§ 7101-7112)", and DFARS clauses giving United States "Domestic" preferences for U.S. Transportation Methods and Specialty Metals.  JA28-29; JA 35.

The Contract included by reference the FAR clause pertaining to "Availability of Funds," which states the following:

> Funds are not presently available for this contract.  **The Government's obligation under this contract is contingent upon the availability of appropriated funds from which payment for contract purposes can be made.**  No legal liability on the part of the Government for any payment may arise until funds are made available to the Contracting Officer for this contract and until the Contractor receives notice of such availability, to be confirmed in writing by the Contracting Officer**.**

JA29; FAR 52.232-18 (emphasis added).

16

The CPA enacted Memorandum Number 4 in 2003, well before the

Solicitation was issued, for the purpose of including provisions in contracts that

were to be paid for using Development Fund for Iraq ("DFI") money.  JA568;

*MAC I,* ASBCA No. 56355, at 9.  Memorandum Number 4 specifically stated that

a contract that the Memorandum was incorporated in would not be subject to the

CDA.  JA312; JA568; *MAC I,* ASBCA No. 56355, at 9.  The parties agree that

Memorandum Number 4 was not included in the Contract or in any of the delivery

orders.  JA312; JA568; *MAC I,* ASBCA No. 56355, at 9.

## V.    The CPA Was Created And Functioned As An Executive Agency Of The United States, And Specifically As A Component Of The Department Of Defense.

In May 2003, the CPA was created by the Commander of the Coalition

Forces in Iraq, United States Army, who was also the Commander of the U.S.

Central Command.  JA429; Halchin, June 2005 CRS Report, at CRS-12.  The

Administrator of the CPA reported to the President of the United States through the

Secretary of Defense.  JA309.  The CPA Administrator's job was to oversee, direct

and coordinate all U.S. Government Programs and activities in Iraq.  *Id.*  The CPA

Administrator and the CPA were vested by the President of the United States with

all executive, legislative and judicial authority necessary to achieve the US's

objectives.  *Id.* The CPA administrator was in charge of all U.S. Government

employees in Iraq other than those answering to U.S. Central Command.  *Id.*

17

The CPA Administrator was supported by a team of 695 <u>interagency U.S. employees</u>. JA309. That team was the nucleus of Iraq's administrative apparatus and maximized the contributions from other countries and organizations. *Id.* The team supporting the CPA administrator, made up of U.S. personnel, relied on coalition partners, consultants, contractors, and non-governmental organizations for additional support. *Id.* The CPA issued solicitations and awarded contracts using both appropriated funds and funds designated for the DFI. JA310.

## VI. The Defense Department Successor Contracting Offices To The CPA Continued To Use This Contract Pursuant to the Defense Department's Direction To Order Vehicles Long After The CPA Itself Dissolved.

Prior to the dissolution of the CPA, the President of the United States established two organizations through National Security Presidential Directive ("NSPD") 36, dated May 11, 2004, to carry on some of the work of the CPA: (1) the Iraq Reconstruction Management Office ("IRMO"), within the Department of State; and (2) the Project and Contracting Office ("PCO"), within the Department of Defense. JA315. The PCO was to be responsible for all activities associated with program, project, asset, construction and financial management of that portion of the reconstruction effort undertaken by the U.S. *Id.* On June 28, 2004, the CPA ceased operations and the United States established diplomatic relations with the Iraqi government. JA314; JA576; *MAC I,* ASBCA No. 56355, at 17.

The Contract contained a provision stating that:

> Contract administration will be retained by the procuring contracting office of the CPA Contracting Activity, Rm S106B, Republican Presidential Compound, Baghdad, Iraq APO AE 09335. <u>In July 2004, contract administration will be transferred to the Program Management Office (PMO), Baghdad, Iraq.</u> Invoices are to be submitted to the contracting officer for approval and submission to the DFAS Indianapolis-Vendor Pay Office in, conjunction with the receiving report (DD Form 250). Accounting and appropriation data will be cited on each individual delivery order.

JA27 (emphasis added).

The PCO, however, took the place of the PMO and, upon the dissolution of the CPA, the administration of the Contract was transferred to the PCO, an agency within the Department of Defense.  JA314.  The Secretary of the Army, then delegated oversight of the PCO to  the Assistant Secretary of the Army for Acquisition, Logistics and Technology ("ASA (ALT)").  JA315.

In October 2004, the U.S. Central Command designated the U.S. Army as the lead component for contracting for Operation Enduring Freedom in the Combined Joint Operations Area, Iraq and Afghanistan, and the JCC-I/A was established.  JCC-I/A provides contracting support under the ASA (ALT) as the Army Acquisition Executive to both the Iraq reconstruction effort and to the combatant commanders in Iraq and Afghanistan.  JA315.  The JCC-I/A was headed by a two-star General Officer who was designated by the ASA (ALT) as Head of the Contracting Agency ("HCA") for Iraq and Afghanistan.  *Id.*

The PCO and JCC-I/A issued delivery orders under the Contract after the CPA's dissolution, and received and accepted deliveries completed by MAC between June 28, 2004 and the date of MAC's final deliveries in approximately June of 2005. JA323. It is undisputed that all delivery orders issued by the PCO or JCC-I/A were paid in full with U.S. appropriated funds. JA317.

## SUMMARY OF THE ARGUMENT

The Government paid MAC using appropriated funds, but paid 51 of MAC's invoices late; therefore, MAC is entitled to receive $420,582.72 in PPA interest based on the Government's admitted tardiness in making those payments. MAC is also entitled to recover CDA interest, accruing from the date the contracting officer received the certified claim until paid. 41 U.S.C. § 7109(a). There is no dispute about MAC delivering the vehicles, the U.S. accepting and using the vehicles to further its goals in Iraq, the Government making payment to MAC using appropriated funds, or that the Government made several late payments. The only argument made by the U.S. Government as to why MAC is not entitled to PPA interest is that the CPA is not a U.S. Government entity.

The Contract expressly states that it is subject to the PPA, and that the Government must pay MAC interest for any untimely payments. The Government admits that the Contract is subject to the PPA, that MAC performed its contractual obligations, that the Government paid MAC using U.S. appropriated funds, and

that the Government did in fact make payments late.  In spite of these facts, the

ASBCA wrongly decided that the PPA did not apply to this Contract because the

CPA is not a U.S. Government entity.

The ASBCA's determination that the CPA is not a U.S. Government entity

is error, and should be reversed, because the facts here show beyond a

preponderance of the evidence that the CPA was in fact part of the Department of

Defense, an executive agency of the United States Government.  First, Congress,

when it funded the CPA, and the CPA itself, in answering questions during a pre-

proposal conference, called the CPA a U.S. Government entity.  The contracting

officers who both awarded the Contract and administered the Contract were U.S.

employees with warrants from the U.S.  They were spending, in all delivery orders

at issue in this case, funds appropriated by Congress.  Nevertheless, the ASBCA

ignored all of these facts in ruling that the CPA is not a U.S. Government entity.

Second, the Contract itself contained contract clauses directly from the FAR

and DFARS, regulations that only apply in contracts entered into by the U.S.

Government.  Specifically included in the Contract was the FAR Disputes Clause,

which referenced the CDA, as well as the FAR Contract Terms and Conditions

clause, which expressly references the PPA.  JA311-312; JA570; *MAC I*, ASBCA

No. 56355, at 11.  Nevertheless, despite the express language of the Contract

incorporating by reference the PPA and the CDA, the ASBCA held the CPA is not a U.S. Government entity.

## STANDARD OF REVIEW

Under the express language of the Contract Disputes Act, 41 U.S.C. §§ 7101–7109 ("CDA"), this Court reviews decisions of the Armed Services Board of Contract Appeals to dismiss for lack of jurisdiction de novo. *See* 41 U.S.C. § 7107(b)(1); *Bright v. United States*, 603 F.3d 1273, 1281 (Fed. Cir. 2010) ("We review the court's dismissal for lack of jurisdiction and its underlying legal conclusions without deference."); *Gould, Inc. v. United States*, 67 F.3d 925, 928 (Fed. Cir. 1995) (stating"[w]hether a motion to dismiss for lack of jurisdiction has been properly granted is a question of law subject to complete and independent review on appeal."); *Arnold M. Diamond, Inc. v. Dalton*, 25 F.3d 1006, 1010 (Fed. Cir. 1994) ("Whether or not the Board has jurisdiction is a question of law.").

On a motion to dismiss an action for lack of subject matter jurisdiction, the Board must "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995), citing *Scheuer v. Rhodes*, 416 U.S. 232, 236-37 (1974). A "waiver of sovereign immunity must be strictly construed in favor of the sovereign," *Orff v. United States*, 545 U.S. 596, 601-02 (2005), but a plaintiff is only required to

establish subject-matter jurisdiction by a mere preponderance of the evidence.

*Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Where, as here, the sole issue is whether pleaded contracts are covered by

the CDA, statutory interpretation is a question of law that the Federal Circuit will

review *de novo*. *Lear Siegler Servs. v. Rumsfeld*, 457 F.3d 1262, 1265-66 (Fed.

Cir. 2006); *Wesleyan Co., Inc. v. Harvey*, 454 F.3d 1375,1378 (Fed. Cir. 2006).

## ARGUMENT

I.    **The Board Erred In Dismissing MAC's Prompt Payment Interest Claim Because the Prompt Payment Act Applies To The 16 Delivery Orders Funded By U.S. Appropriated Funds.**

   A.    **The Prompt Payment Act Applies To All U.S. Executive Agencies And Their Components.**

By enacting the PPA, Congress has expressly instructed that U.S.

government agencies pay interest when they are late in making payment to

contractors, like MAC here, for goods and services under a written contract.  *See*

31 U.S.C. § 3901 *et seq.*  Specifically, the PPA states:

> [T]**he head of an agency acquiring property or service from a business concern, who does not pay the concern for each complete delivered item of property or service by the required payment date, shall pay an interest penalty to the concern on the amount of the payment due**. The interest shall be computed at the rate of interest established by the Secretary of the Treasury, and published in the Federal Register, for interest payments under section 7109 (a)(1) and (b) of title 41, which is in effect at the time the agency accrues the obligation to pay a late payment interest penalty.

31 U.S.C. § 3902(a) (emphasis added).

Indeed, the ASBCA itself has recognized that, under the PPA, an interest penalty is automatically due to the contractor if (1) payment is not made by the due date, (2) the government has authorized payment, and (3) there is no disagreement over quantity, quality, the contractor's contract compliance, or the requested amount. *Versar, Inc.*, ASBCA No. 56857, 12-1 BCA ¶ 35,025.

In *Gosselin World Wide Moving NV*, ASBCA No. 55365, 06-2 BCA ¶ 33,428, the Board held that it had jurisdiction over a contractor's claim for Prompt Payment interest against a component of the Defense Department. There, the contractor entered into a Tender of Service Agreement with the Surface Deployment and Distribution Command (the "SSDC"). The Government argued that the Board did not have jurisdiction because the CDA and PPA did not apply in contracts involving common carriers.

The ASBCA in *Gosselin* rejected the Government's argument, holding that the SSDC is a Command within Defense Department and that the PPA, including the Government's interest obligations, applied in contracts entered into by components of the Department of Defense. Therefore, the ASBCA had jurisdiction to decide the contractor's appeal for Prompt Payment interest.

### B.     The Prompt Payment Act Is Applicable Here, And There Is No Dispute That The U.S. Government Paid MAC Late.

This case presents an example of how boards and courts should interpret and give meaning to the express terms and conditions contained in parties' contracts.

24

*See*, *e.g.*, *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1288 (Fed. Cir. 2008) ("Generally, this court also construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative."); *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.").

The subject Contract incorporates the PPA, and the Board erred in dismissing MAC's appeal for lack of jurisdiction. It is undisputed that the Contract incorporated several FAR provisions by reference, including FAR 52.212-4 "Contract Terms and Conditions." JA311-312; JA570; *MAC I*, ASBCA No. 56355, at 11. That clause, plainly inserted at section I of the Contract and in Box 27b of each delivery order, explicitly states:

> Prompt payment. The Government will make payment in accordance
> with the Prompt Payment Act (31 U.S.C. 3903) and prompt payment
> regulations at 5 CFR Part 1315.

FAR 52.212-4(*i*)(2), incorporated into the Contract. JA29; JA311; JA570; *MAC I*, ASBCA No. 56355, at 11. Indeed, the Government has already admitted that the PPA is applicable to those delivery orders issued to MAC that were funded with U.S. appropriated funds. JA142.

In addition, the PPA expressly states that a contractor may file a claim for an interest penalty still owed by the Government in accordance with the CDA. *See* 31

U.S.C. § 3907(a).  FAR 52.212-4(d) and FAR 52.233-1, both incorporated by

reference into the Contract, expressly state "[t]his Contract is subject to the

Contract Disputes Act of 1978, as amended…"  JA28-29.

Here, the Government has admitted everything necessary for this Court to

determine that the Board has jurisdiction over MAC's claims for PPA interest.  Of

particular import are the following:

1.  The Government admitted that the PPA is applicable to those delivery orders issued to MAC that were funded with U.S. appropriated funds, the only orders at issue in this matter.  JA142.

2.  The Government admitted that the ASBCA has jurisdiction over the delivery orders funded with U.S. appropriated funds.  JA119.

3.  The Government admitted that MAC submitted invoices to the U.S. Government for payment after Government personnel accepted delivery of the subject vehicles.  JA141.

4.  The Government admitted that it "failed to make on time payments for some of the invoices under D/Os funded with appropriated funds." JA142.

5.  The Government admitted that MAC fully performed all of its obligations under the Contract.  JA141, 146.

6.  The Government admitted that MAC submitted a CDA claim seeking recovery for "late payment of vehicles delivered to the Government." JA118.

The Government has only one argument in attempting to deny paying

Prompt Payment interest, namely that the CPA is not a U.S. Government entity.

However, that does not preclude MAC receiving Prompt Payment interest here for

two reasons.  First, as explained below, the Government's position is incorrect.

Second, the ASBCA, as well as the Court of Claims, has repeatedly found a contractor, like MAC here, is entitled to Prompt Payment interest even in situations where the Government alleges no interest is due.

For example, in *Technology for Comm'ns Int'l*, ASBCA Nos. 36265, 36841, 93-3 BCA ¶ 26,139, the Government argued that interim payments under a cost-reimbursement contract were not subject to Prompt Payment interest.  There, like here, there was no dispute about quantity, quality, the contractor's contract compliance, or the requested amount.  *See* JA118, 141-42, 146.  The Board, in an issue of first impression, held that the contracts at issue were subject to the PPA, and that the Government was liable for Prompt Payment interest for those payments it made late.

In addition, in *Arkansas Best Freight Sys., Inc. v. United States*, 20 Cl. Ct. 776, 778-79 (1990), the Court of Claims held that the Government was liable for Prompt Payment interest because, despite the Government's argument, there was no dispute where the Government paid the vouchers at issue.  *See also Held & Francke Bauaktiengesellschaft GmnH*, ASBCA No. 42463, 42464, 92-1 BCA ¶ 24,712 (granting foreign contractor Prompt Payment interest even though Government argued foreign contractors are not entitled to interest).  Therefore, this Court should overrule the ASBCA's decision, hold it has jurisdiction over MAC's

appeal, and remand to the ASBCA with instructions to adjudicate MAC's Prompt

Payment interest claim on the merits.

### C. The ASBCA Erred In Dismissing MAC's Appeal By Relying On Two Cases From The Court of Federal Claims That Involved Factual Scenarios Completely Different From The Case.

The ASBCA's decision, relying on *Laudes Corp. v. United States*, 86 Fed.

Cl. 152, 165 (2009) ("*Laudes II*"), stated that extensive involvement by the U.S.

government is insufficient to establish CDA jurisdiction.  JA9; *MAC II*, ASBCA

No. 56355, at 9.  As an initial matter, the Court of Federal Claims in *Laudes II*

expressly stated that the CPA is "*a United States entity*."  86 Fed. Cl. at 155

(emphasis added).  That is MAC's argument in this case -- CPA is a United States

entity that is subject to the PPA, and the Government is therefore liable to MAC

for PPA interest on the invoices the Government admittedly paid late.

However, the ASBCA's reliance on *Laudes II* fails to recognize the

numerous critical factual distinctions between that decision and the case at bar.

There, the contractor claimed the U.S. was liable for breach of an express contract

between Plaintiff *and the Iraqi Government*.  *Laudes II*, 86 Fed. Cl. at  165

(emphasis added).  The contract was signed by the Iraqi Ministry of Defense, Dr.

Zia Cattan.  The contract there was given the number USMI–04–CONTIG–FOB–

01.  Contract funding was listed as "IRAQI MINISTRY OF DEFENSE

AUTHORIZED FUNDING" while payment would be made by the Iraqi Ministry

of Defense.  *Id.* at 156-57.  Indeed, during contract negotiations Laudes expressed "concerns about receiving payment from the Iraqi MOD in light of the limited functionality of the IIG."  *Id.* at 156.

Further, the contract in *Laudes II* did not expressly incorporate by reference the CDA or PPA.  Instead, the contract there stated the contract would be subject *similar to* the Contract Disputes Act of 1978, and that "[t]*he Iraqi Government will make payment similar to* the United States Laws with the Prompt Payment Act (31 U.S.C. 2903) and prompt payment regulations at 5 CFR part 1315."  *Id.* at 157 (emphasis added).  Indeed, the contractor in *Laudes II* received partial payment from Dr. Cattan, on behalf of the Iraqi Ministry of Defense.  *Id.* at 158.

Those facts are completely opposite to MAC's Contract here.  MAC's Contract was with the CPA, which the court recognized as "*a United States entity*."  *Laudes II*, 86 Fed. Cl. at 155.  MAC's Contract was signed by a U.S. contracting officer that was acting pursuant to his warrant, and he signed in Box 31a of the Contract on behalf of the "UNITED STATES OF AMERICA."  JA24.  Box 27b of the Contract stated it incorporated by reference FAR 52.212-4, which is the clause for "Contract Terms and Conditions—Commercial Items."  JA24.

MAC's Contract stated that payment would be made from U.S. appropriated funds from Defense Finance and Accounting Service ("DFAS").  JA24.  Indeed, MAC did receive payment from U.S. appropriated funds.  JA317.  MAC's

Contract was given the number W914NS-04-D-0017, JA24, which, as explained

below, is a distinctive number used by the U.S. Army Corps of Engineers, not the

Iraqi Government.  All of these facts, most notably the court's statement in *Laudes*

*II* that the CPA is a "United States entity," were ignored by the ASBCA, and

require remand.

 The ASBCA's decision here also cited *MAC I*, which relied, in part, on

*Laudes Corp. v. United States*, 84 Fed. Cl. 298 (2008) ("*Laudes I*").  *See MAC I*,

10-2 BCA ¶ 34,591.  In *Laudes I*, the contractor entered into two separate contracts

with the CPA, one of which was funded entirely with DFI funds.  *Laudes I*, 84 Fed.

Cl. at 300.  That contract included a specific provision noting "that all payments

would be made from the Development Fund for Iraq, and would not involve the

appropriated funds of any Coalition Country…"  *Id.*  The court held that it lacked

jurisdiction because the U.S. "clearly transferred sovereignty in Iraq from the CPA

to the IIG, and with that, authority **over DFI-funded contracts.**"  *Id.* at 320

(emphasis added).   The court relied on the fact that the Laudes contract was only

funded with DFI funds, and specified that no U.S. appropriated funds could be

used.  In contrast, under MAC's Contract, appropriated funds were used to fund

Delivery Orders both before and after the CPA was dissolved, and the Contract

clearly indicates that appropriated funds were to be used to fund those Delivery

Orders.

In addition, the contract in *Laudes I* expressly incorporated the CPA Memorandum No. 4, which governed the terms and conditions contract using "Iraqi funds." *Laudes I*, 84 Fed. Cl. at 303, 307. Most notably, that Memorandum stated contracts using "Iraqi funds" would not be subject to the CDA. *Id.* at 304. Here, however, it is undisputed that MAC's Contract did not incorporate, and was not subject to, Memorandum 4. JA24-41; JA312; JA568; *MAC I,* ASBCA No. 56355, at 9. The contract in *Laudes I* was transferred, in accordance with Memorandum 15, from the CPA to the Iraqi Interim Government (the "IIG") upon the CPA's dissolution in June 2004. *Laudes I*, 84 Fed. Cl. at 304, 315. In contrast, MAC's Contract expressly states that in July 2004, contract administration would be transferred from the CPA to the Program Management Office (PMO) in Baghdad. JA27. Rather than being transferred to the Iraqi government, as in *Laudes I*, MAC's Contract was transferred to an entity of the U.S. Department of Defense, which finally became the DCMA's JCC-I/A. JA571; *MAC I,* ASBCA No. 56355, at 12.

Further, the holding in *Laudes I* was limited to the question of whether the Government had authority to transfer the DFI-funded contract to the IIG. While Laudes argued that the Government impliedly promised to remain a party to the contract for any contractual disputes, the court held that this was incorrect because (1) there was no such explicit language in the Contract; and (2) the fact that it

31

expressly called for payments with DFI funding precluded Laudes from seeking damages against the U.S. *See* 84 Fed. Cl. at 324. Importantly, there is no contractual provision in MAC's Contract stating that payment would be made with DFI funds. To the contrary, MAC's Contract contained, as one of several FAR clauses, FAR 52.231-18 "Availability of Funds", which expressly states that "[t]he Government's obligation under this contract is contingent upon the availability of appropriated funds from which payment for contract purposes can be made." JA24; JA29. In line with that clause, MAC was paid with U.S. appropriated funds.

Laudes' contract also specifically exempted the contract from the CDA, and required all disputes to be resolved in accordance with FAR 52.233-1. 84 Fed. Cl. at 307. These facts sharply contrast with MAC's Contract, and are not addressed by either the Government or the ASBCA. Specifically, no provision in the Contract here limited the funding source to DFI funds, and a specific provision made the Contract subject to the CDA and PPA. JA24, JA28-29; JA570; *MAC I*, ASBCA No. 56355, at 11.

The ASBCA ignored these distinctions when it relied on *Laudes II*, and earlier *Laudes I*, and its decision dismissing jurisdiction was done in error. This Court should reverse and remand to the ASBCA for a determination of MAC's claim to Prompt Payment interest on the merits.

## II. The Board Has Jurisdiction Over This Contract Executed By The Coalition Provisional Authority.

The Government's only argument regarding why MAC should not be paid PPA interest is that the CPA is not a U.S. Government entity. However, that position is contradicted by the statements of Congress, the CPA itself, and the Government in a separate court proceeding.

### A. The Contract Disputes Act Expressly Confers Jurisdiction Over Contracts Entered Into By Executive Agencies or Components.

Pursuant to the CDA, the Board has subject matter jurisdiction over "any express or implied contract … entered into by an executive agency for … the procurement of property, other than real property in being." 41 U.S.C. § 7102(a)(1). "Procurement" is defined as "the acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government." *Wesleyan*, 454 F.3d at 1378. Further, under the CDA, a plaintiff need only allege the existence of a contract to establish the Board's jurisdiction under the CDA "relative to" an express or implied contract with an executive agency. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011).

### B. The Contract Disputes Act And Title 5 Clearly Establish That Government Agencies, Such As The Department Of The Defense And Department Of The Army, Are Government Entities.

The CDA also defines what constitutes an "executive agency." Specifically, the CDA states term "executive agency" includes executive departments as defined in section 101 of title 5, and military departments as defined in section 102 of title

5. 41 U.S.C. § 7101(8); *see also Anselma Crossing, L.P. v. United States Postal Serv.*, 637 F.3d 238, 243 (3d Cir. 2011); *A & S Council Oil Co., Inc. v. Lader*, 56 F.3d 234, 242 (D.C. Cir. 1995) (the Small Business Administration is an executive agency for CDA purposes); *City of Burbank v. United States*, 47 Fed. Cl. 261, 268 & n.10 (2000) (stating the Bonneville Power Administration is a component of the Department of Energy and therefore an "executive agency" for CDA purposes), *rev'd on other grounds* 273 F.3d 1370 (Fed. Cir. 2001).

The Department of Defense is expressly identified as an executive agency in the U.S. Code. 5 U.S.C. § 101; 41 U.S.C. § 7101(8); *Eimskipafeleg Island, EHF*, ASBCA No. 55209, 07-2 BCA ¶ 33,620. Indeed, in *Maersk Line, Ltd.*, ASBCA No. 55391, 07-2 BCA ¶ 33,621, the ASBCA found it had jurisdiction because the Defense Department is an executive agency, and the contracts were for "services." Therefore, the Board held that any disputes arising out of these contracts were governed by the CDA. In addition, the Department of the Army, Appellee in this case, is expressly identified as a military department, 5 U.S.C. § 102, and constitutes an "executive agency" under the CDA. 41 U.S.C. § 7101(8). Therefore, the ASBCA has jurisdiction over any contract entered into by the Department of the Army, the Department of the Defense, or their components.

C.    **The Coalition Provisional Authority Is An Executive Agency Of The United States Government.**

1.    **Both Congress And The CPA Declared The CPA Was An Entity Of The United States**

This Court should reverse and remand because statements made by the U.S. Congress while funding the CPA contradict the Government's arguments here. Congress stated, in referring to the CPA, "that funds appropriated under this heading shall be apportioned only to the Coalition Provisional Authority in Iraq (***in its capacity as an entity of the United States Government***) ...." FY2004 Appropriations, § 2101, 117 Stat. at 1225 (emphasis added).

In addition to the Congressional guidance, the CPA itself represented to bidders that it was an entity of the United States. In answers to pre-proposal questions submitted by bidders, the CPA stated "The Sector Program Management Office ("SPMO") is a government entity." JA425; List of Questions and Answers compiled from a Pre-Proposal Conference held on June 21, 2004," p. 20.

2.    **The CPA Was Included In Title 5 By Virtue Of Its Status As A Component Of The Department Of Defense.**

a.    **The CPA Was Not The International Coalition Itself, The CPA Was The DoD's Administrative Arm Providing Stability During Reconstruction.**

The ASCBA ruled in its decision that the CPA was an international entity and that to find otherwise would be to ignore or nullify the significant contributions of the United States' coalition partners. JA8; *MAC II,* ASBCA No.

56355, at 8.  The ASBCA has erred in treating the CPA as if it were the Coalition

itself.  Creation, control, and administration of the CPA rested solely in the hands

of the U.S., and it was instructed to protect and implement U.S. goals.  The

International Coalition of Forces that went into Iraq and contributed to its

restoration existed before the CPA, and it still exists today.  The CPA, on the other

hand, was a tool and instrumentality of the United States Department of Defense.

> **b.    The CPA Was A Component Of The Department Of Defense And Therefore Included Under Title 5's Designation Of DoD As An Executive Agency.**
>
> > (1)    <u>CPA As A Component Of The Department Of Defense Falls In Line With The Statutory Language And Prior ASBCA Precedent.</u>

As explained above, "executive agency" for purposes of the CDA means:

(1) an executive department as defined in Section 101 of Title 5; (2) an

independent establishment as defined by 5 U.S.C. § 104; (3) a military department

as defined in 5 U.S.C. § 102, and (4) a wholly owned Government corporation.  41

U.S.C. § 7101.  5 U.S.C. § 101 lists 14 executive agencies, including the

Department of Defense, and 5 U.S.C. § 102 expressly identifies the Department of

the Army, Appellee here, as a military department subject to CDA jurisdiction.

The CPA is a component of the Defense Department, and the ASBCA's

ruling to the contrary is error that requires remand.  The individual components,

offices and entities within the Defense Department are not specifically listed in

Title 5.  Congress does not modify Title 5 every time an executive agency creates a new component.  The Government could not dispute that agencies not listed in Title 5, such as the Defense Intelligence Agency ("DIA") or the National Security Agency ("NSA"), are components of the Defense Department and are covered under the CDA.

The ASBCA has already decided that agencies or entities not expressly listed in Title 5 are components of the Defense Department and are covered under the CDA.  In *Eagle Alliance*, ASBCA No. 56315, 08-1 BCA ¶ 33,828, the ASBCA, in determining whether the NSA was a component of the Department of Defense, relied on DoD Directives and the way the agency was treated.  As a result, the ASBCA concluded that the NSA was a DoD Component and, therefore, the Board had jurisdiction over it under the CDA.  *Id.*

Here, however, the ASBCA refused to accept that an entity (i) created by a General in the United States Army (as the Government argued in another matter), (ii) administered by an official reporting to the Secretary of Defense and the President of the United States, (iii) which received appropriations through defense bills, (iv) was staffed by uniformed and civilian DoD employees, and (v) operated entirely as a part of Defense Department, is a Defense Department component for purposes of the CDA.  As discussed in detail below, DoD Directive 5101.1 and DoD Instruction 4000.19 each affect the CPA in similar ways to how the NSA was

37

treated in *Eagle Alliance*. This treatment illustrates how the CPA was a DoD component acting in conjunction with the U.S. Army and other DoD components during performance of the Contract.

> (2)    The Defense Department's Treatment Of The CPA Clearly Shows That The Department Considers the CPA As A Defense Department Component.

On June 16, 2003, the Deputy Secretary of Defense issued a memorandum to the Secretaries of the Military Departments and throughout the Defense Department dissolving the Office of Reconstruction and Humanitarian Assistance ("ORHA"), and transferring all of its "functions, responsibilities and legal obligations" to the CPA. JA413. In addition, the Secretary of the Army's responsibilities with regard to providing administrative support to ORHA under the Deputy Secretary of Defense's May 21, 2003 memorandum designation as the Department of Defense executive agent for ORHA were transferred to the CPA. JA432-433. This memorandum plainly shows that the Deputy Secretary of Defense believed that the CPA was a Defense Department component, because, as explained below, executive agents can only be assigned when the entities in question are Defense Department components. JA432-433, JA461-467.

A "DOD Executive Agent" is the "Head of a Defense Department Component to whom the Secretary of Defense or the Deputy Secretary of Defense has assigned specific responsibilities, functions, and authorities to provide defined

levels of support for operational missions, or administrative or other designated activities that involve two or more of the DoD Components." JA462; DoD Directive 5101.1 (Sept. 3, 2002) (emphasis added). DOD Executive Agent is a term used in Department of Defense and Service regulations to indicate a delegation of authority by a superior to a subordinate to act on behalf of the superior when two DoD components are cooperating on a specific set of duties. According to this definition, the Army has accepted and is treating the CPA as a "DoD Component." The DoD Executive Agent website still maintains and identifies the Army as the Executive Agent of the CPA. JA470. Therefore, this Court should rule the ASBCA has CDA jurisdiction, and reverse the ASBCA's decision to the contrary.

> ### 3. The Government Argued In A Separate Case That The CPA Was An Instrumentality Of The United States.

The Government's position in this case cannot be reconciled with its argument in *United States ex rel DRC, Inc. v. Custer Battles,* LLC, 562 F.3d 295 (4th Cir. 2009). There, the Government supported the relators' argument that defendant Custer Battles met the presentment requirement of the False Claims Act by submitting false invoices to a U.S. Contracting Officer who was a member of the CPA. *Id.* at 297. The Fourth Circuit stated:

> On appeal, **the relators, supported by the United States as amicus curiae, contend that the district court erred** (1) in limiting the applicability of the False Claims Act to a claim for funds paid from

the United States Treasury; (2) **in concluding that U.S. government personnel detailed to the Coalition Provisional Authority were not "officer[s] or employee[s] of the United States government" for purposes of the False Claims Act**; and (3) in granting summary judgment in favor of Custer Battles on the fraud claim alleged in connection with the second contract.

*Id.* at 297-98 (emphasis added).

Also in *Custer Battles,* the Government received questions from the court regarding how the CPA was established and whether or not the personnel working there were operating in their official capacity. The Government responded as follows in a 2005 brief:

> **The CPA was created by the Commander of the Coalition Forces in Iraq, General Tommy Franks, United States Army, who was also the Commander of the U.S. Central Command.** The establishment of the CPA by the Coalition was formally recognized by UNSCR [United Nations Security Council Resolution 1483].
>
> Since the Coalition Forces had established and exercised actual authority over the territory of Iraq, under the laws of war and occupation, the authority of the  defeated Iraqi regime of Saddam Hussein passed into the hands of the Coalition Forces. **General Franks established the CPA under the laws of war to perform civil government functions in liberated Iraq during the brief occupation.**

JA429; Halchin, June 2005 CRS Report, at CRS-12 (emphasis added).

In direct conflict with the Government's position here is the Department of Justice's position asserted in *Custer Battles.* In its brief, the Government stated that the CPA should be considered an instrumentality of the U.S. Government under the False Claims Act because the CPA Administrator reported to the

President of the United States and all of the money spent for the subject contracts

were spent at the direction, and under the authority of, U.S. Government personnel.

Specifically, the Government stated:

> Two factors tip the scale in favor of the conclusion that **the CPA should be deemed to be an instrumentality of the United States for purposes of the False Claims Act. First is the nature of the appointment and supervision of Ambassador Bremer as Presidential Envoy and Administrator of the CPA. All authority of the CPA rested in the Administrator, and Ambassador Bremer was employed by the United States, served at the pleasure of the President, and was under the supervision of the President and the Secretary of Defense. Second, coupled with the status of Ambassador Bremer, is the fact that all of the money used for the two contracts at issue in this case was spent only on the authority and control of an officer or employee of the United States or a member of the Armed Forces of the United States....** Thus, while we emphasize again that the answer to the Court's latest question on the nature of the CPA is not necessary to determine whether or not defendants violated the FCA when they presented claims to the CPA under the two contracts at issue in this litigation, we nevertheless conclude that the CPA is an instrumentality of the United States for purposes of the False Claims Act.

JA455; Halchin, June 2005 CRS Report, at CRS-38 (emphasis added). The trial

court in *Custer Battles* held that the defendant had no False Claims liability

because the CPA was not a U.S. government entity. *See United States ex rel DRC,*

*Inc. v. Custer Battles, LLC*, 444 F. Supp. 2d 678, 688-89 (E.D. Va. 2006). On

appeal, the Fourth Circuit reversed, holding that U.S. contracting officers, while

detailed to the CPA, were functioning as employees of the United States to do

precisely the jobs that the United States hired them to do full-time and for which

the United States paid them.  Therefore, the defendants were liable under the False

Claims Act for claims presented to U.S. government employees.  *See* 562 F.3d at

307.

The Government's statement by the Government in *Custer Battles* best sums

up MAC's argument in this case:  the CPA is an instrumentality of the U.S.

Government for purposes of the CDA and PPA because (1) Ambassador Bremer

was appointed by and reported to President Bush, and (2) all of the funds at issue

in this case were spent only on the authority and control of an officer or employee

of the United States or a member of the U.S. Army.

In spite of its earlier pronouncement in *Custer Battles*, the Government here

is advancing the irreconcilable position that when it wants to collect money from

contractors who have submitted false claims to the CPA, the personnel working at

the CPA are acting in their official capacity as officers of the United States.

However, when a contractor, like MAC here, is seeking to collect upon obligations

entered into by those same procurement officers, the U.S. is not bound.  The

Government cannot have it both ways.

The ASBCA's decision provides a potential defense for contractors faced

with False Claims Act allegations arising from their performance of a CPA-

administered contract, and the decision suggests that U.S. procurement law does

not apply to such CPA contracts.  There is a risk that since, under the ASBCA's

decision, the Government is immune from contract claims because it was not a party to such contracts, that the Government will not be able to pursue fraud claims under such contracts with foreign entities. This places additional taxpayer dollars at risk and provides a potential safe haven for contractors who have committed fraud against the Government.

### 4. The Contract Was Awarded By The CPA Contracting Activity, Which Was A Department Of Defense Entity.

#### a. W914NS Is The DODAAC For The United States Army Corps Of Engineers Iraq Reconstruction Office.

The ASBCA placed a great deal of weight on the fact that the CPA was listed on the front of the contract as the contracting party versus listing the U.S. Government or the Defense Department. JA2-3, JA6; *MAC II*, ASBCA No. 56355, at 2-3, 6. This was in error. Agencies within the Defense Department do not list the U.S. Government or the Defense Department in Block 6 of the contract, they simply identify themselves as the agency that is issuing the contract.[4]

The ASBCA states in its decision that there was no reference to the U.S. Government as a contracting party in Block 6 of the IDIQ Contract or the delivery orders. Such a statement, however, was unnecessary since the Contract was issued under a Department of Defense Contract number. A government contract number

---

[4] We assume the ASBCA meant Block 9 since Block 6 is the Solicitation issue date and does not reference any entity.

can communicate a significant amount of information about a contract. The

Defense Department's contract numbers are made up of four parts: 1) The agency

identifier, 2) The fiscal year of the contract's award, 3) A letter to designate the

contract type, and 4) The transaction number. In DoD procurements the first six

numbers of a government contract are called the Department of Defense Activity

Address Code ("DoDAAC"). A DoDAAC is a six position code that uniquely

identifies a unit, activity, or organization that has the authority to requisition and/or

receive material. Defense Logistics Agency, Logistics Management Standards

Frequently Asked Questions; available at www.DLA.mil/j-6/dlmso/aboutfaq.asp.

Here, the DoDAAC for the Contract, W914NS-04-D-0117, is W914NS.

JA2; *MAC II*, ASBCA No. 56355, at 2; JA24. W914NS is the unique unit

designator for the United States Army Corps of Engineers Iraq Reconstruction

Office. This United States Army DoDAAC appears in blocks 1, 2 and 5 of the

IDIQ contract and on each of the 21 delivery orders issued. JA24. This use of a

U.S. Army DoDAAC was not hidden and clearly indicated that the responsible

agency was an element of the U.S. Army.

> **b.** **The Contract And Delivery Orders Each Indicated That Payment Was To Be Made By U.S. Government Entities.**

The Contract's funding codes expressly state that the U.S. Government is

providing appropriated funds to pay MAC. Funding codes are complex series' of

numbers and letters that are used to associate funding with contracts. This system allows the payment office to determine which appropriation is to be used to pay the contractor. No one other than the payment office, however, actually breaks down the various codes within the fund site to determine the actual appropriation. Even the Contracting Officer does not know what a particular code means beyond the fact that it provides funding for the procurement. JA351-352.

Although not apparent to MAC, the various numbers identified in Box 26 identify the source of funding (at least to the government): Appropriations Data starting with "21" are Army funding and numbers starting with "20" are Department of Treasury funding according to the Department of Treasury Fastbook. Financial Management Service, Federal Account Symbols and Titles: The FAST Book II, Part II, at A-27 -- A-29 (April 2013), available at http://www.fms.treas.gov/fastbook/fastbook_april_2013.pdf.

The Contract also states that invoices are to be submitted to the Contracting Officer for approval and payment for deliveries would be made to MAC by DFAS-IN DNO, which refers to the U.S. Government's Defense Finance and Accounting Service, Indianapolis branch office. JA24; JA311. Later delivery orders that were issued list the U.S. Army Corps of Engineers Finance as the entity responsible for making payments. *See*, *e.g.*, JA83.

The ASBCA erred when it dismissed MAC's appeal.  MAC's Contract and claims are subject to both the CDA and PPA.  The Government has already admitted in this case that the Contract is subject to the PPA, that MAC performed its contractual obligations, and the Government untimely paid some of MAC's invoices using appropriated funds.  Unlike *Laudes I* and *Laudes II*, which the ASBCA relied on to dismiss MAC's appeal, MAC's Contract expressly incorporated by reference the PPA and CDA.  MAC received payment from the Government using appropriated funds for each delivery order at issue here, and MAC's Contract number contained a specific U.S. Army Corps of Engineers number, which are both distinguishable from the contracts in *Laudes I* and *II*.

## CONCLUSION

The ASBCA erred in its determination that it lacked jurisdiction over MAC's claim for PPA interest, which the Government owes for repeatedly paying MAC late.  The Contract expressly states that it is subject to the PPA, and that the Government must make interest payments to MAC for untimely payments.  The Government admitted that the PPA applies to this Contract, that MAC performed its contractual obligations, that the Government made payments to MAC using U.S. appropriated funds, and that the Government paid several invoices late. Indeed, the Government admitted that the ASBCA has jurisdiction over those

delivery orders, the same orders at issue in this case, that were funded with U.S. appropriated funds.

The ASBCA erred in concluding that the CPA is not a U.S. Government entity.  The CPA was created, managed, funded, staffed and treated as a component of the Department of Defense.  The Contract was issued by the CPA: under a Corps of Engineers DoDAAC; it included FAR and DFARS clauses; it invoked the CDA; it indicated appropriated funding; it was awarded by a U.S. Air Force Colonel on U.S. Forms.  The administration of the Contract included executed and completed delivery orders and all of them at issue in this case were paid by the Corps of Engineers and DFAS with U.S. appropriated funds.

The ASBCA erred in confusing the CPA with the actual Coalition Forces. MAC is not trying to downplay the involvement of the Coalition Forces in Iraq nor their sacrifices, but the fact is that the CPA itself was not an international entity. Its role and responsibility was to further U.S. projects and interests in the reconstruction of Iraq.  It is undisputed that MAC acted in good faith and delivered the 7,602 vehicles the U.S. needed to execute its mission in Iraq.  It is also undisputed that the U.S. Government paid MAC for the vehicles, but paid late in several instances.  Therefore, Prompt Payment interest is warranted for MAC, and MAC is also entitled to recover CDA interest, accruing from the date of its certified claim.

MAC's dismissed claims should therefore be re-instated and remanded to the ASBCA for adjudication on the merits.

Respectfully submitted,

_/s/ Daniel P. Wierzba_
Sara Beiro Farabow
Donald G. Featherstun
Daniel P. Wierzba
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC 20004-1454
(202) 463-2400

Counsel for MAC International FZE

Dated:  October 15, 2013

## PROOF OF SERVICE

The undersigned attorney certifies that he caused a true and correct copy of

MAC International FZE's Opening Brief to be served upon the following on the

15th day of October, 2013 by using the appellate CM/ECF system:

> Michael N. O'Connell, Esq.
> Trial Attorney
> Commercial Litigation Branch
> Department of Justice
> P.O. Box 480
> Ben Franklin Station
> Washington, DC 20044


> */s/ Daniel P. Wierzba*
> Sara Beiro Farabow
> Donald G. Featherstun
> Daniel P. Wierzba
> SEYFARTH SHAW LLP
> 975 F Street, N.W.
> Washington, DC 20004-1454
> (202) 463-2400
>
> Counsel for MAC International FZE

Dated:  October 15, 2013

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,283 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 program in 14 font size and Times New Roman type style.

       */s/ Daniel P. Wierzba*
Sara Beiro Farabow
Donald G. Featherstun
Daniel P. Wierzba
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC 20004-1454
(202) 463-2400

Counsel for MAC International FZE

Dated:  October 15, 2013

2013-1560

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MAC INTERNATIONAL FZE

Appellant,

v.

John McHugh, SECRETARY OF THE ARMY,

Appellee.

Appeal From the Armed Services Board of Contract Appeals No. 56355,
Administrative Judge Diana S. Dickinson

## <u>Addendum To Brief For Appellant MAC International FZE</u>

Sara Beiro Farabow
Donald G. Featherstun
Daniel P. Wierzba
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington DC  20004
Tel:  202-828-3591
Fax: 202-828-5393

ATTORNEYS FOR THE
APPELLANT
MAC INTERNATIONAL FZE

Dated:  October 15, 2013

## ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| MAC International FZE | )   ASBCA No. 56355 |
| | ) |
| Under Contract No. W194NS-04-D-0117 | ) |

APPEARANCES FOR THE APPELLANT:     Sara Beiro Farabow, Esq.
Michael J. Bauer, Esq.
Joshua C. Drewitz, Esq.
Seyfarth Shaw LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Raymond M. Saunders, Esq.
Army Chief Trial Attorney
CPT Tudo N. Pham, JA
Trial Attorney

### OPINION BY ADMINISTRATIVE JUDGE DICKINSON
### ON GOVERNMENT MOTION TO DISMISS FOR LACK OF JURISDICTION

This appeal arises from a MAC International FZE (MAC or appellant) claim against the United States government for reimbursement under a contract between MAC and the Coalition Provisional Authority (CPA) in Iraq. In the claim MAC sought: (1) that part of the contract price that had not been paid, plus interest under the Prompt Payment Act (PPA), 31 U.S.C. §§ 3901-3907, under delivery orders (DOs) 8 and 9, that had been funded with Development Fund for Iraq (DFI) funds; and (2) PPA interest based on allegedly late payments made under 16 additional DOs that had referenced United States government appropriated funds. The part of the claim involving DOs 8 and 9 was the subject of a government motion for partial summary judgment or, in the alternative, to dismiss for lack of jurisdiction. The Board granted the government's motion and dismissed that claim, finding that it did not have jurisdiction to hear disputes relating to DOs 8 and 9. *MAC International FZE*, ASBCA No. 56355, 10-2 BCA ¶ 34,591 ("*MAC I*"). Familiarity with the earlier decision is assumed.

MAC appealed our earlier decision to the United States Court of Appeals for the Federal Circuit. The appeal was voluntarily dismissed in May 2012. We then requested the parties brief whether the Board had jurisdiction to consider the remainder of the claim involving the PPA interest sought under the 16 DOs. The government has filed a motion to dismiss the remainder of the appeal for lack of subject matter jurisdiction and appellant has opposed the motion. The parties have fully briefed the matter and rely upon the

record previously submitted in support of *MAC I*. We incorporate in this decision pertinent findings made in *MAC I*. The government's motion is granted.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. The CPA was created by coalition partners in 2003 under the laws and usages of war and was recognized by the United Nations Security Council as "a temporary entity formed under applicable international law by the coalition partners as occupying powers under unified command." *MAC I*, SOF ¶¶ 1-4. More than ten countries, including the United States and the United Kingdom, contributed significant amounts of money, personnel and various other resources to support the operation of the CPA. *MAC I*, SOF ¶¶ 5, 6. One of the many contributions of support to the CPA made by the U.S. government was the assignment of U.S. Army personnel to provide program management and acquisition support to the CPA and any successor entity. At the time the contract at issue was awarded, the Army performed these functions in support of the CPA within the CPA Contracting Activity which was specifically referenced in the contract as the responsible office. *MAC I*, SOF ¶¶ 7, 15. The CPA created the Program Review Board (PRB) to, among other things, recommend the obligation and disbursement of funds contributed to the CPA for and on behalf of the Iraqi people. Membership of the PRB was comprised of 20 officials including officials representing the CPA, United States, United Kingdom, Australia and various international financial organizations and Iraqi ministry officials. The funds authorized for disbursement by the PRB included U.S. government appropriated monies contributed to the CPA and various Iraqi-sourced funds. *MAC I*, SOF ¶ 8. The CPA issued contracts obligating Iraqi funds and U.S. government appropriated funds that had been contributed in support of the CPA. Only CPA contracting officers were authorized to issue contracts on behalf of the CPA. Even though individuals may have been contracting officers for coalition countries, they could not award CPA contracts unless they received specific delegated authority to do so from the CPA Head of Contracting or a designee. *MAC I*, SOF ¶ 10.

2. On 24 April 2004 the CPA awarded indefinite delivery/indefinite quantity (IDIQ) Contract No. W914NS-04-D-0117 to MAC. No other contracting party was identified in the contract. Under the contract, appellant was to deliver various General Motors vehicles in Iraq for a not-to-exceed amount of $122,213,569.00 pursuant to the terms of specific DOs. The contract contained no funding information; funding for each particular DO was referenced in that DO. In total, MAC delivered 7,602 vehicles under the DOs issued under the contract. *MAC I*, SOF ¶¶ 14-16. The 16 DOs now at issue are:

| DO No. | Issuing Contracting Office | Date Issued |
|--------|---------------------------|-------------|
| 1-2    | CPA Contracting Activity  | 24 Apr 2004 |
| 3      | CPA Contracting Activity  | 12 May 2004 |

| 4 | CPA Contracting Activity | 18 May 2004 |
|---|---|---|
| 6 | CPA Contracting Activity | 11 Jun 2004 |
| 7 | CPA Contracting Activity | 12 Jun 2004 |
| 11-12 | CPA Contracting Activity | 23 Jun 2004 |
| 13 | PCO[1] Contracting Activity | 8 Jul 2004 |
| 14 | PCO Contracting Activity | 18 Jul 2004 |
| 15 | PCO Contracting Activity | Bef. 2 Apr 2005[2] |
| 16 | PCO Contracting Activity | 8 Jul 2004 |
| 17 | PCO Contracting Activity | 24 Jul 2004 |
| 18 | PCO Contracting Activity[3] | 26 Jul 2004 |
| 20 | PCO Contracting Activity | 2 Jan 2005 |
| 21 | JCC-I/A[1] | 11 Aug 2005 |

(R4, tabs 4, 8, 12, 15, 22, 25, 46, 49, 51, 55, 58, 60, 64, 70, 76, 80)  The address of the contracting office referenced as issuing each of the DOs to MAC remained the same regardless of the name of the contracting activity that issued any particular DO.  *Id.*  All of the DOs now at issue contained, in Block 25 of Form SF1449, U.S. government appropriated fund cites.  *MAC I*, SOF ¶ 17.  It is undisputed that MAC was paid for the vehicles delivered under these 16 DOs.

3. On 28 June 2004, the CPA was dissolved and all authorities, responsibilities, and obligations were transferred to the Interim Iraqi Government (IIG) with whom the United States then established diplomatic relations.  *MAC I*, SOF ¶¶ 21, 22.  The CPA's 28 June 2004 Order Number 100, TRANSITION OF LAWS, REGULATIONS,

---

[1] *See* SOF ¶ 3 below.

[2] The record does not contain the DO; however the Material Inspection and Receiving Reports for DO 15 show that MAC first shipped vehicles under that DO on 2 April 2005 (R4, tab 58).

[3] DO 18 states on its face that the issuing contracting activity is the CPA Contracting Activity.  However, since the effective date of the DO is after the dissolution of the CPA, the issuing office had to be the PCO Contracting Activity.  (R4, tab 70)

ORDERS, AND DIRECTIVES ISSUED BY THE COALITION PROVISIONAL
AUTHORITY, provided:

> This Order makes appropriate revisions to laws,
> regulations, orders, memoranda, instructions and
> directives issued by the CPA to facilitate an orderly
> transfer of full governing authority to the Iraqi Interim
> Government on 30 June 2004. The Order seeks to
> ensure that the Iraqi Interim Government and all
> subsequent Iraqi governments inherit full
> responsibility for these laws, regulations, orders,
> memoranda, instructions and directives so that their
> implementation after the transfer of full governing
> authority may reflect the expectations of the Iraqi
> people, as determined by a fully empowered and
> sovereign Iraqi Government. This is the final Order of
> the CPA, which will dissolve on 30 June 2004, after
> the transfer of full governing authority to the Iraqi
> Interim Government.

> *http://www.iraqcoalition.org*.

*MAC I*, SOF ¶ 22. There is no evidence that any obligation of the CPA was transferred
from the CPA to anyone other than the IIG. Upon the dissolution of the CPA, the IIG
delegated to the Project and Contracting Office (PCO) the responsibility of overseeing
the expenditure of U.S. government appropriated funds contributed in support of Iraqi
reconstruction. *Id.* In October 2004, the Joint Contracting Command-Iraq/Afghanistan
(JCC-I/A) was established to provide contracting support for (1) Iraqi reconstruction
begun under the CPA and continued by the IIG and (2) Operation Enduring Freedom
military efforts in Iraq and Afghanistan. *MAC I*, SOF ¶ 23. Pursuant to specific
delegation of contracting authority by the IIG, the PCO and then the JCC-I/A supplied
continuing contracting support through 31 December 2007 for CPA contracts that were in
existence as of the 28 June 2004 dissolution of the CPA and which were transferred to the
IIG upon dissolution. *MAC I*, SOF ¶¶ 23, 26. The contract now at issue was one of those
contracts.

    4. On 14 February 2008, approximately six weeks after the 31 December 2007
expiration of IIG's delegation of authority to the JCC-I/A to handle contracting matters
on the IIG's behalf, MAC submitted a certified claim for $5,598,129.52 to the JCC-I/A.
In the portion of the claim now remaining before us, MAC sought PPA interest in the
amount of $653,629.52 for vehicles delivered under 16 DOs (nos. 1-4, 6, 7, 11-18, 20,
21) for which it had been paid, but allegedly later than required by the PPA. *MAC I*, SOF
¶ 25. The JCC-I/A advised that it no longer had any contracting authority as the

delegation of such from the IIG had expired; MAC filed this appeal from the "deemed denial" of its claim. *MAC I*, SOF ¶¶ 26, 27.

DECISION

The sole issue remaining before us in this appeal is the PPA interest sought by appellant under 16 DOs that referenced U.S. government appropriated funds contributed to the CPA for Iraqi reconstruction. The government has moved to dismiss this remaining part of the appeal for lack of subject matter jurisdiction (gov't mot. at 1-4).[4]

Appellant opposes the government's motion and, first, argues that the government did not previously challenge the Board's jurisdiction to hear the dispute involving the 16 DOs now before us (app. opp'n at 6-7). The existence of our jurisdiction can be challenged at any time and cannot be conferred by consent, estoppel, or waiver. *See, e.g., Brazos Electric Power Cooperative, Inc. v. United States*, 144 F.3d 784, 788 (Fed. Cir. 1998); *Diggs v. Department of Housing and Urban Development*, 670 F.3d 1353, 1355 (Fed. Cir. 2011).

Appellant's primary argument in opposition to the government's motion is:

> Contracting authority over the 16, non-DFI funded Delivery Orders never transferred to the IIG. These Delivery Orders are U.S. contracts issued by U.S. Contracting Officers using U.S. money for the benefit of the U.S. Government. When the CPA dissolved, the U.S. Government served as the contracting activity and exercised authority over the 16 Delivery Orders.

(App. opp'n at 7) MAC further argues that the governmental contracting party after the dissolution of the CPA was the PCO and not the IIG, so the Board's earlier decision that no executive agency was involved does not apply and we have jurisdiction under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109.[5] More particularly, MAC argues that, unlike the situation in our earlier decision which involved the DFI funds, only U.S. appropriated funds were used in the 16 DOs now at issue and, for that reason, MAC argues that liabilities under the DOs were not transferred to the IIG, but were liabilities of

---

[4] The government also argues the merits of appellant's claim to PPA interest (gov't mot. at 4-5). Given our resolution of the jurisdictional argument, we need not address the substantive issues.

[5] We note that this argument would seem to apply only to the DOs 13-18, 20, and 21 which were issued after the PCO (and later the JCC-I/A) became the contracting activity. DOs 1-4, 6, 7, 11, and 12 were issued by the CPA.

the U.S. government. (App. opp'n at 7-11) As discussed below, the record does not support MAC's position.

The contract under which the DOs now before us were issued was a contract between the CPA, an international entity, and MAC. The U.S. government was never a party to the contract nor to any of the DOs. *MAC I*, 10-2 BCA ¶ 34,591 at 170,515-17. The U.S. government's role in the contracting process (through the CPA Contracting Activity, PCO and JCC-I/A) was solely as the specific delegate of the CPA until its dissolution on 28 June 2004 and, after the dissolution of the CPA, by specific delegation by the IIG. MAC argues that the 16 DOs now at issue were U.S. government contracts and that, after dissolution of the CPA, they were obligations of the U.S. government and did not transfer to the IIG (app. opp'n at 7). However, the DOs issued under the CPA contract, to which the U.S. government was never a party, obligated the same contracting party as the contract itself: the CPA and, by virtue of CPA Order Number 100, any successor entities such as the IIG. And, since the U.S. government was never a party to the contract or the DOs, it could not be the obligated party after dissolution of the CPA.

MAC's arguments focus on the presence of U.S. government personnel, funds, contracting forms, etc. in the contracting process as if they were dispositive evidence that, despite the express terms of the contract and the DOs to the contrary, the U.S. government and not the CPA and IIG was the contracting party. As we stated in *MAC I*:

> On the basis of the foregoing, it is apparent to us that the CPA was an international entity and was not an entity of any of the member nations of the CPA, including the U.S. government. We find the district court's logic in *DRC I*[6] in this regard persuasive:
>
>> [T]here is no dispute that the CPA was not established by Congress. Instead, as described in a letter to the United Nations, the CPA was an entity created by the United States, United Kingdom, and its Coalition partners "acting under existing command and control arrangements through the Commander of Coalition Forces." Moreover, the United Nations recognized the CPA, not as an instrumentality of the United States, but as an entity through which the Coalition nations acted "as occupying powers under unified command." UNSCR 1483. And while the substantial majority of

---

[6] *United States of America ex rel. DRC, Inc. v. Custer Battles, LLC*, 376 F. Supp. 2d 617 (E.D. Va. 2005), *rev'd in part on other grounds and remanded*, 562 F.3d 295 (4th Cir. 2009).

the CPA staff was comprised of United States employees, a significant portion - 13% - hailed from other Coalition partners. Thus, the CPA may also be described as an international body formed by the implicit, multilateral consent of its Coalition partners, which would not be subject to the specific laws of its member states.... Given the fluid nature of the conflict in Iraq and the challenges of establishing a new government in a war zone, it is not surprising that the organization of the CPA appears at times to have been ad hoc and to have relied heavily on the resources of its largest contributing member. Thus it would seem that, like NATO or any other international organization created by the multilateral consent of multiple member nations, whether by treaty or otherwise, the CPA is not an instrumentality of each of its members [sic] states, distinctly subject to the laws of all of its members, but a wholly distinct entity that exercises power through a structure agreed to by its member states and that is subject to the laws of war and to its own laws and regulations.

*DRC I*, 376 F. Supp. 2d at 650....

....

...And, indeed, the result of that analysis is clear-although the CPA was principally controlled and funded by the U.S., this degree of control did not rise to the level of exclusive control required to qualify as an instrumentality of the U.S. government. *See Rainwater*, 356 U.S. at 592-94, 78 S. Ct. 946. In fact, the evidence clearly establishes that it was created through and governed by multinational consent....

*DRC II*,[7] 444 F. Supp. 2d at 688-89.

*MAC I*, 10-2 BCA ¶ 34,591 at 170,516-17.

---

[7] *United States of America ex rel. DRC, Inc. v. Custer Battles, LLC*, 444 F. Supp. 2d 678 (E.D. Va. 2005), *rev'd in part on other grounds and remanded*, 562 F.3d 295 (4th Cir. 2009).

While our earlier decision necessarily addressed itself to DOs 8 and 9, which were funded with DFI funds, the existence of our jurisdiction is not changed by the fact that the 16 DOs at issue in the remainder of the appeal contained U.S. government appropriated fund cites. As we held in *MAC I*:

> We find the U.S. government's role in the CPA, as reflected in the record before us and in existing case law, to be entirely consistent with its role as a coalition partner who made very significant contributions of money, personnel and expertise.[11] The use by the government of its various agencies, including the Department of Defense and Department of State, among others, as part of the United States' contribution is entirely consistent with its role as a coalition partner in the CPA. The government's appointment of the Army to have lead responsibility to provide support to the CPA in the areas of contract awards, administration and financial management is also entirely consistent with its role as a coalition partner. This conclusion is further supported by the express delegation of authority by the IIG for continued contract administration by the Army through the PMO, PCO and JCC-I/A after the dissolution of the CPA.

> The government did not become the CPA (nor did the CPA become the government) by virtue of the government's use and contribution of its resources in its role as a coalition partner. And we do not find it surprising, nor at all inappropriate, that the government would want U.S. government-led oversight of the significant contribution of appropriated funds it had made to the CPA. Further, the government's resources were not the only significant contributions made by coalition partners to the CPA. More than ten other coalition partners and nations also contributed money, personnel and expertise. This is all consistent with the CPA's status as an international entity and consistent with the government's status as one of many coalition partners. To hold otherwise would be to ignore or nullify the significant contributions of the multi-national coalition partners other than the U.S. government and we decline to do so.

> In our view, therefore, the CPA was an international entity and not a [U.S.] government entity. As a result, the CPA is not an executive agency for purposes of the CDA and

8

there is no basis for jurisdiction to consider this appeal under the CDA....

....

[11] The fact that the government (DoD, Army, Department of State, etc.) paid the wages and salaries of the government personnel while they worked in support of the CPA (including Administrator Bremer) is entirely consistent with it making a contribution of those wages and salaries in its role as a coalition partner.

*MAC I*, 10-2 BCA ¶ 34,591 at 170,517-18, 170,520 (citations omitted).

Further operating against the existence of jurisdiction over MAC's claim for PPA interest is the requirement that a dispute under the PPA must be asserted in a claim under the CDA. 31 U.S.C. § 3907; *Randolph and Co.*, ASBCA No. 52953 *et al.*, 03-1 BCA ¶ 32,080 at 158,586. As we quoted above and discussed at length in *MAC I*, the CDA is not applicable to the contract between the CPA and MAC nor, by extension, the DOs issued under that contract. *MAC I*, 10-2 BCA ¶ 34,591 at 170,515-18.

We have previously held that extensive involvement by the U.S. government in the form of personnel, contract forms, oversight and even funding is insufficient to establish CDA jurisdiction where the government was not a party to the contract. *See, e.g., CDK Contracting Co.*, ASBCA No. 44997, 93-3 BCA ¶ 26,068. As the Court of Federal Claims held recently, and specifically as it relates to CPA contracts and U.S. government support of the CPA:

[E]ven extensive involvement by the United States in administering the…contract cannot overcome the lack of privity of contract between the [contractor] and [the government].… Even extensive, de facto control of the contract cannot create a contract where no privity exists.

*Laudes Corp. v. United States*, 86 Fed. Cl. 152, 165 (2009).

*MAC I*, 10-2 BCA ¶ 34,591 at 170,516.

## CONCLUSION

For the foregoing reasons, we do not have jurisdiction to decide the merits of the remainder of ASBCA No. 56355 and grant the government's motion to dismiss for lack of subject matter jurisdiction.

Dated:  23 April 2013

DIANA S. DICKINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

JACK DELMAN
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 56355, Appeal of MAC International FZE, rendered in conformance with the Board's Charter.

Dated:    APR 2 4 2013

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

10